UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

SCOTTSDALE INSURANCE COMPANY,

    Plaintiff,

v.                                                      Civil Action No. _____

THE ELIOT AT CATSKILL, LLC,
KENNETH LERRICK MD, and DEBRA J.
RINALDI,

    Defendants.
_____

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, SCOTTSDALE INSURANCE COMPANY ("Scottsdale"), by and through its undersigned attorneys, sets forth the following in support of its Complaint for Declaratory Judgment pursuant to 28 U.S.C. § 2201:

### STATEMENT OF THE CASE

1.    Scottsdale Insurance Company ("Scottsdale") brings this insurance coverage action to obtain a judicial determination that it does not have the duty to defend or indemnify Eliot at Catskill, LLC ("Eliot") or Kenneth Lerrick MD, in connection with a lawsuit brought by Debra J. Rinaldi and pending against them in the Supreme Court of Dutchess County, NY, Index No. 2021-55091, captioned *Debra J. Rinaldi v. The Eliot at Catskill, LLC. et al.* ("Underlying Lawsuit").

### THE PARTIES

2.    Plaintiff, Scottsdale is a corporation organized under the laws of Ohio with its principal place of business in Scottsdale, Arizona.

3.    Defendant, Eliot is a limited liability company with its principal place of business located in Catskill, New York. Each of its members is a citizen of New York and none of its members is an Ohio or Arizona citizen.

4. Defendant, Dr. Lerrick is a citizen of New York and resident of Westchester County, New York.

5. Defendant, Rinaldi is a resident of Greene County, New York. She is named as an interested party by virtue of her status as the underlying plaintiff.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over all parties, pursuant to 28 U.S.C. § 1332(a), since the amount in controversy exceeds $75,000, exclusive of interests and costs, and the parties are citizens of different states. More specifically, the cost to continue defending Eliot, in addition to the potential cost to indemnify Eliot and Dr. Lerrick, will be well in excess of $75,000, especially considering that the maximum available insurance coverage is $1,000,000.

7. Venue is appropriate under 28 U.S.C. § 1391(b)(1), as Eliot conducts business in this district, this action involves a coverage dispute with respect to the Underlying Lawsuit pending in this district, and the coverage dispute arises from events that occurred in this district.

8. An actual justiciable controversy exists between Scottsdale, on the one hand, and Eliot, Dr. Lerrick, and Rinaldi, on the other hand, and by the terms and provisions of Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, this Court is vested with the power to declare the rights and liability of these parties and to grant such relief as it deems necessary and proper.

## THE SCOTTSDALE POLICY

9. Scottsdale issued to Eliot an insurance policy, No. OPS0070026, effective June 19, 2021 to June 19, 2022 ("Policy"). A true and correct copy of the Policy is attached hereto and incorporated herein as **Exhibit A**.

10. The Policy contains a Professional Liability Coverage Part, which includes an Insuring Agreement that states, in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as **DAMAGES** because of injury as a result of a **WRONGFUL ACT**. This

> insurance applies to injury only if **CLAIM** for **DAMAGES** because of the injury is first made against the insured during the **POLICY PERIOD** ….

\* \* \*

11. The Policy defines "**WRONGFUL ACT**" as "any act, error or omission in the furnishing of professional health care services. It includes the furnishing of food, beverages, medications or appliances in connection with those services."

12. The Policy contains an Absolute Exclusion – Primary Medical Care Endorsement (CLS-422 (12-12)), which modifies the Professional Liability Coverage Part and states:

> There is no coverage under this Coverage Part for any insured arising out of any **WRONGFUL ACT** for **PRIMARY MEDICAL CARE**.
>
> **SECTION VII—DEFINITIONS** is amended to include the following:
>
> **PRIMARY MEDICAL CARE** means any medical care of any type except for the evaluation, diagnosis, and treatment of any mental illness, substance abuse or behavioral health (including, but not limited to, physical intake assessments and medical detoxification) of your patients.

\* \* \*

13. The Policy also contains a commercial general liability coverage part, which states, in relevant part:

> **SECTION I – COVERAGES**
>
> **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1.  Insuring Agreement**
>
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" … to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" … to which this insurance does not apply. …

\* \* \*

14. The Policy's commercial general liability coverage part is subject to a Professional Services Exclusion, which states: "This insurance does not apply to 'bodily injury' … due to the rendering of or failure to render any professional service."

## THE UNDERLYING LAWSUIT

15. On December 29, 2021, Rinaldi initiated the Underlying Lawsuit with the filing of a Verified Complaint and Jury Demand against Eliot and Dr. Lerrick as a contract employee of Eliot at the relevant times. A true and correct copy of the Verified Complaint is attached hereto and incorporated herein as **Exhibit B**.

16. Rinaldi's Verified Complaint states causes of action for malpractice, violation of N.Y. Public Health Law § 2801(d), and violation of the Nursing Home Reform Law of 1987.

17. Rinaldi clarified in her Verified Bill of Particulars that she was a resident of Eliot from June 19, 2019 through August 4, 2019.

18. Rinaldi also clarified in in her Verified Bill of Particulars that she contends that the acts and omissions of which she is complaining were performed by Dr. Lerrick and the "patient staff at the [Eliot] facility." This includes the "nursing staff involved in resident admission and registration, ambulatory assistance and administration of medication."

19. In Count I, Rinaldi alleges that Eliot and Dr. Lerrick negligently departed from accepted medical standard by: "failing to utilize requisite knowledge and skills for proper prescription, administration, and reconciliation of Plaintiff's medications"; "failing to monitoring the patient for adverse reaction to medication"; "prescribing and/continuing Amantadine for 'off label' use at an inappropriately high dosage"; "prescribing and/or continuing multiple neuropathic medications without adequately monitoring their combined effects on the patient"; "failing to timely access that the patient was suffering from toxic encephalopathy"; "failing to properly access the effect of long-term accumulation of medication related metabolites on the patient's condition"; "failing to properly

access the effect of the patient's weight loss on her prescribed medications and dosages"; "failing to timely or properly adjust the patient's medications and dosages"; "failing to properly adjust the patient's diet and feeding"; "failing to consult with the patient's neurologist"; "failing to refer the patient for neurological and dietary consult"; and otherwise departing "from accepted standards of medical care."

20. In her Verified Bill of Particulars, Rinaldi adds that Eliot and Dr. Lerrick's malpractice and negligent "departure[s] from accepted standards of nursing home care" included "failing to promulgate or enforce necessary admission procedures concerning the reconciliation of resident medications, medical history and presenting symptomatology"; "failing to be attentive of medications prescribed at excessive dosages and/or off label"; "failing to properly assess the plaintiff's fall risk"; "failing to take necessary precautions warranted by the plaintiff's condition"; "failing to adequately test for pre-disposition to black-out or faint"; "failing to adequately test for difficulty with gait and balance"; "failing to ensure proper foot wear"; "failing to properly adjust bed height"; "failing to provide or properly adjust bed rails"; "failing to ensure elimination of clutter and tripping hazards"; "failing to provide increased staff for assistance at high traffic periods in the day"; "failing to provide necessary medical services including regular physician visit including timely intake examination"; "failing to properly reconcile the resident's medications"; "failing to appropriately provide for consult with necessary medical including neurology"; "failing to administer Amantadine, or its generic equivalent, to the resident as prescribed by the physician"; "improperly administering Amantadine, or its generic equivalent, to the resident at an improper dosage"; "failing to consult with the prescribing physician before administering a confusing or difficult to interpret prescription order"; "failing to properly assess that the resident was suffering from toxic encephalopathy and neuropathy attributable to inappropriate polypharmacy and the accumulation of pharmaceutical metabolites"; "failing to properly assess the impact of long-term accumulation of medication related metabolites on the

resident"; "failing to properly monitor or record the resident's signs and symptoms of toxic encephalopathy and neuropathy including, unsteadiness, weight loss, neurological deterioration, delirium, visual disturbances, slurred and difficult speech and tremors"; "failing to timely schedule medical consult"; "failing to adequately monitor or report the resident's worsening symptoms"; "failing to properly assess the impact of the resident's weight loss and body habitus on the effect of the medications she was prescribed"; "failing to obtain necessary neurological examinations"; "failing to obtain and/or properly interpret necessary CT, MRI, EEG, and ECG"; "failing to obtain and/or properly interpret necessary TDM (Therapeutic Drug Monitoring) studies"; "improperly prescribing and continuing and administering Amantadine, or its generic equivalent, off label and at an excessive dosage"; "failing to titrate and taper the patient from excessive and improper medications including Amantadine, or its generic equivalent"; and "failing to consult with the prescribing physician concerning a confusing or difficult to interpret prescription."

21. As a result of these acts or omissions, Rinaldi alleges injuries, including toxic encephalopathy, neuropathy, seizures, memory loss, cognitive disfunction, propensity for falls, hip fracture, ORIF, hip arthroplasty, and aspiration pneumonia.

22. In her Verified Bill of Particulars, Rinaldi adds that she has suffered from headache, lack of concentration, personality change, agitation, lethargy and fatigue, depression, seizures, syncope, NSTEMI, a fractured pelvis, open reduction with internal fixation of the hip, leg length discrepancy, impairment of gait, necessity for walker, exacerbated Parkinsonian symptoms, Parkinsonian crisis, hypoxia, altered mental status, hallucinations, stupor, tremors, delirium, slurred speech, dysphagia, neurogenic bladder, interference with activities of daily living, and diminution in the quality and enjoyment of life.

23.     In Count II, Rinaldi alleges Eliot and Dr. Lerrick, by reason of the same negligent "departures from accepted standards of medical care," failed to comply with the requirements of the Nursing Home Reform Law of 1987.

24.     In Count III, Rinaldi alleges Eliot and Dr. Lerrick, by reason of the same negligent "departures from accepted standards of medical care," failed to comply with the requirements of New York Public Health Law Section 2801(d).

25.     Through discovery in the Underlying Lawsuit, Rinaldi has distilled her allegations against Eliot and Dr. Lerrick to those concerning the prescription of Amantadine, which was used to treat her multiple sclerosis, and an August 4, 2019 fall while Rinaldi was a resident at Eliot.

26.     Scottsdale is defending Eliot, pursuant to a full and complete reservation of rights, including the right to disclaim any and all coverage available under the subject insurance policies, in the Underlying Lawsuit. Scottsdale is also defending Dr. Lerrick as an employee of Eliot on an excess basis subject to any other professional liability insurance available.

## COUNT I
## NO DUTY TO DEFEND OR INDEMNIFY
## UNDER THE PROFESSIONAL LIABILITY COVERAGE PART

27.     Scottsdale realleges and restates Paragraphs 1-26 above as if fully stated herein.

28.     In accordance with the Absolute Exclusion – Primary Medical Care Endorsement (CLS-422 (12-12)), the Professional Liability Coverage Part of the Policy does not afford coverage for "**WRONGFUL ACTS**" for "**PRIMARY MEDICAL CARE**," *i.e.*, "any medical care of any type except for the evaluation, diagnosis, and treatment of any mental illness, substance abuse or behavioral health (including, but not limited to, physical intake assessments and medical detoxification) of your patients."

29. The gravamen of the Underlying Lawsuit, as well as all of the allegations of wrongdoing that caused the injuries Rinaldi suffered, involve the administration of "**PRIMARY MEDICAL CARE**," as that term is defined in the Policy.

30. In particular, Rinaldi's claims about the prescription, administration, adjustment, and monitoring of Amantadine was for the purpose of treating her multiple sclerosis. Amantadine was not used to treat Rinaldi's mental illness, substance abuse, or behavioral health, if any.

31. Accordingly, the claims in the Underlying Lawsuit, and the allegations giving rise thereto, clearly fall outside of coverage, and Scottsdale has no duty to defend or indemnify Eliot or Dr. Lerrick, under the Policy's Professional Liability Coverage Part, in the Underlying Lawsuit.

## COUNT II
## NO DUTY TO DEFEND OR INDEMNIFY
## UNDER THE COMMERCIAL GENERAL LIABILITY COVERAGE PART

32. Scottsdale realleges and restates Paragraphs 1-26 above as if fully stated herein.

33. The commercial general liability coverage part of the Policy excludes coverage for "bodily injury" "due to the rendering of or failure to render any professional service."

34. All of Rinaldi's allegations directly relate to "professional services" that a facility like Eliot provides to its residents. As such, Rinaldi's injuries are not covered under the commercial general liability coverage part of the Policy.

35. Accordingly, the claims in the Underlying Lawsuit, and the allegations giving rise thereto, clearly fall outside of coverage, and Scottsdale has no duty to defend or indemnify Eliot or Dr. Lerrick, under the Policy's commercial general liability coverage part, in the Underlying Lawsuit.

WHEREFORE, Plaintiff, SCOTTSDALE INSURANCE COMPANY, respectfully requests this Court to declare and adjudge the controversy as follows:

A. Scottsdale has no duty to defend Eliot under the Policy;

B. Scottsdale has no duty to indemnify Eliot under the Policy;

      C.      Scottsdale has no duty to defend Dr. Lerrick under the Policy;

      D.      Scottsdale has no duty to indemnify Dr. Lerrick under the Policy;

      E.      Scottsdale is entitled to other relief that this Court deems just and equitable under the circumstances, including the award of costs.

DATE: New York, New York
         October 27, 2023

**FREEMAN MATHIS & GARY, LLP**

By: */s/ Justin J. Boron*
Justin J. Boron (5916721)
5 Penn Plaza 23rd Floor
New York, NY 10001
(t) 215.789.4919
Justin.Boron@fmglaw.com
*Attorney for Plaintiff, Scottsdale Insurance Company*